**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

| | | |
|---|---|---|
| **DR. JONATHAN JOHNSON,** | : | Civil Action No. |
| **DR. SHAMEIKA WILLIAMS, and** | : | |
| **DR. CHARMAINE SCARLETT,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **VERIFIED** |
| | : | **COMPLAINT** |
| **-against-** | : | |
| | : | |
| | : | |
| | : | |
| **TEACHERS COLLEGE COLUMBIA** | : | |
| **UNIVERSITY, COLUMBIA UNIVERSITY,** | : | |
| **and THE TRUSTEES OF COLUMBIA** | : | |
| **UNIVERSITY IN THE CITY OF NEW YORK,** | : | |
| | : | |
| **Defendants.** | : | |

-------------------------------------------------------------X

Plaintiffs Dr. Jonathan Johnson ("Plaintiff Johnson"), Dr. Shameika Williams ("Plaintiff Williams") and Dr. Charmaine Scarlett ("Plaintiff Scarlett" and collectively with Plaintiff Johnson and Plaintiff Williams, "Plaintiffs"), by and through their undersigned counsel, allege as follows:

## INTRODUCTION

1.      Plaintiffs bring this action stemming from Defendant Teachers College Columbia University's ("Defendant Teachers College") and Columbia University's (together with the Trustees of Columbia University in the City of New York, "Defendant Columbia") (Defendant Columbia and Defendant Teachers College and herein collectively referred to as "Defendants") failure to redress known and ongoing racial discrimination and harassment by permitting a favored professor to attack and threaten the personal and professional lives of Defendants' African-American students.

2.    Plaintiffs were doctoral candidates at Defendant Teachers College. During the 2022-2023 academic year, Plaintiffs enrolled in seminar classes HBSS 6510.003 and HBSS 7501.003 (collectively, the "Seminars") taught and directed by Dr. Barbara Wallace ("Prof. Wallace"). The Seminars were designed to address disparities in health research wherein students were tasked with conducting their own research, data collection and analysis, and ultimately draft and defend their dissertation.

3.    Initially, Plaintiffs, who are African-American, were excited to engage in the Seminars and looked forward to learning under Prof. Wallace's direction due to Prof. Wallace's reputation as an advocate for the advancement of persons of color in education and research.

4.    However, Prof. Wallace, herself an African-American, proved to be the greatest hindrance to Plaintiffs' advancement in, and graduation from, Defendant Teachers College.

5.    Specifically, at the conclusion of the Seminars, Plaintiffs each received demands to make payment to a vendor, Dr. Curtis Dolezal ("Dr. Dolezal"), whom they had been forced to use by Prof. Wallace during the Seminars. After the successful defense of each of their dissertations, Dr. Dolezal, who is Caucasian, demanded that each of the Plaintiffs pay a fee to him for the subpar work he produced for them throughout the course of the Seminars. Notably, this was the first time any fee obligation to Dr. Dolezal had been disclosed to Plaintiffs and, in light of that, Plaintiffs each made inquiries as to the propriety of Dr. Dolezal's request.

6.    Rather than support her students, Prof. Wallace chose to defend Dr. Dolezal, whom she described as "a great White man." Professor Wallace targeted Plaintiffs with racially motivated attacks on their character, openly encouraged Plaintiffs' fellow students to do the same, and repeatedly threatened the conferral of Plaintiffs' degrees and continued abilities to work in their chosen fields of study.

7.     Despite Plaintiffs' numerous complaints of harassment and discrimination to the administration at Defendant Teachers College, Defendant Teachers College failed to take any action. Even then, Defendant Teachers College intentionally and maliciously and/or negligently prolonged the investigative process to the point where any conclusion, whether in Plaintiffs' or Prof. Wallace's favor., would be futile.

8.     Accordingly, Plaintiffs bring this action against Defendants for discrimination and retaliation in violation of the New York State Human Rights Law, the New York City Human Rights Law, and Titles II and VI of the Civil Rights Act, together with any and all other cause(s) of action which can be reasonably inferred from the facts and allegations as asserted herein.

9.     Plaintiff Williams further brings this action against Defendants for retaliation in violation of the New York State Human Rights Law and the New York City Human Rights Law.

## THE PARTIES

10.    At all times relevant to this Complaint, Plaintiff Johnson was and is a natural person and a resident of the State of New York.

11.    At all times relevant to this Complaint, Plaintiff Williams was and is a natural person and a resident of the State of New York.

12.    At all times relevant to this Complaint, Plaintiff Scarlett was and is a natural person and a resident of the State of Maryland.

13.    Plaintiffs were each enrolled as graduate students at Defendant Teachers College for the 2022-2023 academic year. Plaintiffs Scarlett and Johnson had a projected graduation date and anticipated degree conferral of October 2023, while Plaintiff Williams had a projected graduation date of May 2023.

14.    Upon information and belief, Defendant Teachers College is the United States' largest graduate school of education, located at 525 West 120th Street, New York, New York 10027.

15.    Defendant Columbia maintains an active association with Defendant Teachers College.

16.    Specifically, Defendant Teachers College is the graduate school of education for Defendant Columbia.

17.    Defendant Columbia is the degree conferring body for all degrees and diplomas earned by students enrolled at Defendant Teachers College.

18.    Defendant Columbia is a private Ivy League University located in New York, New York.

19.    Upon information and belief, Defendant Columbia operates under a 1787 charter that places the overall governance of Defendant Columbia in the hands of its twenty-four-member Board of Trustees. The Board of Trustees is entrusted to, among other things, select Defendant Columbia's President, oversee all of Defendant Columbia's faculty and senior administrative appointments, monitor Defendant Columbia's budget, supervise Defendant Columbia's endowment, and protect Defendant Columbia property.

**JURISDICTION AND VENUE**

20.    This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1345.

21.    This court has supplemental jurisdiction over Plaintiffs' state and city law claims pursuant to 28 U.S.C. § 1367 because those claims arise from a common nucleus of operative facts

with Plaintiffs' federal claims such that the adjudication of Plaintiffs' state and city claims with Plaintiffs' federal claims furthers the interest of judicial economy.

22.     Venue is proper in this case pursuant to 28 U.S.C. § 1391 as the acts and/or omissions giving rise to this action occurred in New York County, New York which is situated in the Southern District of New York.

**OPERATIVE FACTS AND ALLEGATIONS**

I.     **Plaintiffs' Backgrounds and Enrollment in the Seminars**

23.     Each of the Plaintiffs are professional, and highly intelligent advocates   with impressive academic and professional backgrounds in public health and social justice.

24.     Each of the Plaintiffs enrolled as students in Defendant Teachers College's doctoral program.

25.     Plaintiffs Scarlett and Johnson had a projected graduation date and anticipated degree conferral of October 2023, while Plaintiff Williams had a projected graduation date of May 2023.

26.     Plaintiffs each enrolled in seminar classes HBSS 6510.003 and HBSS 7501.003 taught by Prof. Wallace for the 2022-2023 academic year.

27.     Plaintiffs each looked forward to working and learning under Prof. Wallace's tutelage given Prof. Wallace's reputation as an advocate for persons of color in the scientific, academic, and research fields.

28.     Upon information and belief, the 2022-2023 academic year was to be Prof. Wallace's final teaching year.

29.     Indeed, Prof. Wallace specifically advised Plaintiff Williams at the beginning of the term and several times throughout the Seminars that she was actively seeking her replacement as she was preparing for and intended to retire.

**II.     Prof. Wallace Displays Troubling Behavior in the Seminars and Forces Plaintiffs to Retain, and Pay, for Unnecessary Consultants and Vendors as Part of their Dissertation Process**

30.     Unbeknownst to Plaintiffs, Prof. Wallace had been repeatedly reported to Defendants for displaying hostility and fostering an unsafe environment in her classes, particularly for Black students.

31.     Defendants were on notice of Prof. Wallace's troubling behaviors and students' feelings of unease and an unsafe environment in her class. Yet, Defendants did nothing to address or remedy Prof. Wallace's behavior, thereby tacitly condoning and acquiescing in it.

32.     Throughout the Seminars, Prof. Wallace frequently displayed alarming behavior towards her students which often appeared racially charged and inappropriate.

33.     By way of example, but not limitation, Prof. Wallace preached to the Seminars' cohort how the Seminars should be their one and only focus during the semesters. Prof. Wallace encouraged the cohort to stop going to the gym, to stop praying, to stop any religious worship, and maintained that the *only* way to get through the Seminars successfully was to follow her method and meditation tactics.

34.     Moreover, throughout the Seminars, Prof. Wallace showed a significantly more aggressive and volatile posture towards Black, particularly Black male, students and often undermined their contributions in the course and took special care to embarrass and demean their contributions before the entire class.

35.     Despite these aggressive and humiliating actions, Plaintiffs were each dedicated to committing themselves fully to the process and excelling in the classes.

36.     In preparation for their respective dissertations and oral defenses thereof, Plaintiffs were required by Prof. Wallace to work with various consultants and vendors in the collection and analysis of data related to their respective dissertation topics.

37.     Although it is commonplace for graduate students to use such vendors and consultants, it was unusual for Prof. Wallace to mandate which vendors and consultants were to be used for each of the students in the Seminars.

38.     On more than one occasion, Plaintiffs or other students in the Seminars raised concerns about the use of the consultants identified by Prof. Wallace.

39.     Specifically, many of the consultants were available to perform work, analysis, or research that either (i) the students were capable of doing on their own without incurring any costs; or (ii) the students were actively learning in other classes and could have conducted on their own, or with the assistance of their other professors, again without incurring any cost.

40.     Many of the vendors named on Prof. Wallace's list of consultants were unnecessary and their retention only added to the students' costs while simultaneously stripping the students of vital learning and research experience.

41.     One such consultant was Dr. Curtis Dolezal ("Dr. Dolezal").

42.     Dr. Dolezal was, and continues to be, a faculty member of Defendant Columbia's Department of Psychiatry.

43.     Dr. Dolezal's consultancy was particularly problematic as Dr. Dolezal's services were well within the Plaintiffs' capabilities of performing on their own.

44.     Moreover, at no point in time were Plaintiffs provided clear guidance or information regarding any fee to be paid to Dr. Dolezal for his services, despite such information being made available with respect to other vendors and consultants.

45.     Prof. Wallace prohibited Plaintiffs and other students from finding their own consultants to work with or performing their own data analysis and research.

46.     Whenever a student brought up the idea of not hiring one of the consultants identified by Prof. Wallace, Prof. Wallace staunchly declared that it was a mandatory part of the Seminars to use *her* consultants and vendors.

47.     Upon information and belief, Prof. Wallace prohibited the students' use of any other professionals, including themselves, not out of a concern for the students but for her own personal gain, as she received a kickback from the retention of her identified consultants.

48.     In light of Prof. Wallace's strict, and unreasonable, mandate, Plaintiffs were forced to work with, and pay for, a series of consultants, including Dr. Dolezal.

49.     Over the course of their studies in the Seminars, Plaintiffs each noticed significant deficiencies in Dr. Dolezal's work on their research and became increasingly concerned about the forced use of his services.

50.     Still, Plaintiffs persevered and, in or around April and early May of 2023, each successfully defended their dissertations.

### III.     Plaintiffs Contest Surprise Fees from Dr. Dolezal

51.     Following the successful oral defense of their respective dissertations, each of the Plaintiffs received a notice from Dr. Dolezal congratulating them on their success and requesting payment for his services

52.     Specifically, Dr. Dolezal requested payment of $1,000 via either personal check (Dr. Dolezal's preferred method of payment) or via Paypal Friends and Family, meaning the payment could not be contested or refunded.

53.     This was the first time that Plaintiffs were made aware of any payment obligations to Dr. Dolezal.

54.     Shocked by this sudden and unexpected request for payment from Dr. Dolezal, Plaintiffs began making various inquiries related to the basis for the fee.

55.     Prof. Wallace staunchly and openly objected to their inquiries,  and went out of her way to berate Plaintiffs and attempted to bully them into paying the fee without further delay or understanding its basis.

56.     Specifically, Plaintiff Williams received Dr. Dolezal's request for payment approximately two weeks after successfully defending her dissertation in May of 2023. Believing the request to be a mistake, Plaintiff Williams ignored Dr. Dolezal's email.

57.     Plaintiff Williams then spoke with Prof. Wallace about her surprise at the fee and her concerns about compensating Dr. Dolezal, especially considering his services were subpar and could have been performed by Plaintiff Williams herself.

58.     In response, Prof. Wallace became irate and exclaimed that she could not believe it was "only the Black students" who had a problem with paying.

59.     In line with Plaintiff Williams' efforts, Plaintiff Johnson also made inquiries into the basis for Dr. Dolezal's fee request and the propriety of the request.

60.     Specifically, having previously worked for Defendant Columbia, Plaintiff Johnson made inquiries to various departments within Defendant Teachers College regarding the his

options to cover the fee, as well as whether such a fee was appropriate in light of Dr. Dolezal's

employment with Defendant Columbia and Defendants' Conflict of Interest policies.

61.     Moreover, after receiving Dr. Dolezal's request for payment, Plaintiff Scarlett

asked Dr. Dolezal for additional information, including the method used to reach the sum of

$1,000.

62.     In response, Dr. Dolezal merely noted that a $1,000 flat fee was "typical" and then,

a month later, made a second request for payment.

63.     Plaintiffs' continued efforts to seek clarity on Dr. Dolezal's fee request only

appeared to anger Prof. Wallace further and she escalated her unlawful and tormenting behaviors

against Plaintiffs.

### IV.   Prof. Wallace Endorses and Encourages the Public Harassment of Plaintiffs by Fellow Doctoral Students and Denies Plaintiffs' Accusations of Racism

64.     Prof. Wallace immediately initiated a coordinated and racially charged campaign

against Plaintiffs.

65.     First, Prof. Wallace contacted each of the Plaintiffs with express threats to their

degrees and continued careers in their chosen fields if they did not, without further delay or inquiry,

immediately pay the fee to Dr. Dolezal.

66.     By way of example, on June 17, 2023, Prof. Wallace sent Plaintiff Scarlett two

back-to-back emails stating:

> Dear Charmaine,
>
> The Research group on Disparities in Health (RGDH) has enjoyed
> more than 15 years of a relationship with Dr. Dolezal—and I will
> not all [*sic*] you to destroy it.
> Please be informed that until your data bill is paid, you will:
> 1-NOT enjoy the first deposit of your doctoral dissertation with my
> approval—meaning you will NOT receive your EdD degree.

> 2-NOT enjoy any letters of recommendation from ever [*sic*] for anything—and no reference checks requested from me will be completed, ever.
>
> PLEASE RELY HERE TO ALL WITH EVIDENCE OF HAVING PAID YOUR BILL.

67.     By way of further example, but not limitation, on or about June 18, 2023, Plaintiff Williams spoke with Prof. Wallace on the phone regarding Dr. Dolezal's fee.

68.     During the call, Plaintiff Williams advised that she believed there was a "racial aspect" to the ongoing situation.

69.     In response, Prof. Wallace became irate and, similar to her threats to Plaintiff Scarlett, threatened that if Plaintiff Williams did not pay Dr. Dolezal's fee, Prof. Wallace would (i) refuse to provide any letters of recommendation moving forward; (ii) ruin Plaintiff Williams' relationship with Defendant Teacher's College and the program; and (iii) rescind any previously submitted letters of recommendation and withhold any future academic or professional support.

70.     Prof. Wallace further told Plaintiff Williams that she would not allow her Black students to ruin "a great White man" such as Dr. Dolezal.

71.     Upon information and belief, and indeed as admitted by Prof. Wallace, Prof. Wallace was ready and willing to make good on her threats against Plaintiffs, and made them with the specific intent to scare and bully Plaintiffs into complying with her and Dr. Dolezal's demands.

72.     After Prof. Wallace's private attacks on Plaintiffs proved unsuccessful, Prof. Wallace recruited the entire Seminar cohort to berate, criticize, and traumatize Plaintiffs.

73.     Specifically, on June 19, 2023, Prof. Wallace sent a group email to the Seminar's current and former students and graduates, including Plaintiffs, announcing that she had chosen to "free herself" and shut down the Seminars for good.

74.    Prof. Wallace, playing off of the significance of Juneteenth, declared herself "FREE" and went on to blame the dissolution of her doctoral program on "the revolt, or revolution" of the three students, specifically. Plaintiffs, who did not pay Dr. Dolezal's fee and had the audacity to question the validity and basis of the fee.

75.    In response to Prof. Wallace's email, many of students made threats and insults towards Plaintiffs, many of which referenced race and culture. <u>See</u> Exhibit A, copy of email chain from Seminars' cohort.

76.    By way of example, but not limitation, Plaintiffs' fellow students stated:

    a.    Those of you who did not pay, PAY UP and know that this puts you on a list of bad karma for your future. How dare you. I regret celebrating you and congratulating you. (Dr. Lucia Alfano);

    b.    The bridges yall have burnt and the long term ramifications of the bridges yall burnt with your slash and burn policy of how you've conducted yourselves as FORMER RGDH fellows you cannot fully appreciate right now—BUT I am sure the universe will balance this all out…those like myself left to pick up the pieces in the wake of RGDH destruction that you've LEFT BEHIND well we may never bear witness to the day the universe will balance itself our for yall but REST ASSURED it will balance out. (Krystal Cruz);

    c.    Yall burnt some serious professional bridges by being ungrateful to Professor Wallace, wait and see. Not one of us will force the hand of Karma as we go onto our respective professional journeys and life trajectories, but the universe ALWAYS balances things and I have compassion for yall when that day comes, *and when it comes* remember you set this all into motion due to the **INTERGENERATIONAL** ramifications in the lives of innumerable Scholars of Color. **God forgive the conspiring trio**. (Krystal Cruz);

    d.    For the 3 students who refuse to pay, you know that you will end up paying the amount you owe Dr. Dolezal in other ways. Karma will make sure of it. (Vanna Som);

    e.    I wish everyone the best and pray for the ungrateful few… What you do to others is a direct reflection of your soul and heart. You will reap what you sow in life. (Vanna Som);

f. Their lack of respect for both their ancestors and their mentors must certainly stem from their ignorance of the heavy burden borne by the masses of black and brown humanity that provided body, arms, and ideas that lifted them into the privileged place in which they stand. []. [W]hose Kool-Aid are they drinking? (Kimberly Bunting, on behalf of her mother Dr. Karia).

77.    After nearly each of the messages sent by students attacking Plaintiffs, Prof. Wallace would respond on the group email chain thanking them for their contributions, praising their statements, and, often times, telling the student she loved them.

78.    After hours of the harassment from classmates, Plaintiffs each individually responded to the group email chain asking for it to end and for there to be a show of compassion.

79.    Specifically, Plaintiff Scarlett wrote, in relevant part,

It saddens me to see the conflict, microaggressions, and temerity present in this email thread. As I read this correspondence and the various opinions amongst my peers I have the following concerns;

The correspondences have attacked the integrity of our peers as well as their cultural backgrounds, personal beliefs, intersectional identities, and ethics. The language used was racially charges, hostile, and disregarded the potential financial circumstances that may have prevented the payment…

I feel physically, mentally, and emotionally unsafe due to the excessive cyber-bullying and threats of ill intent…

80.    Plaintiff Johnson wrote that he found the space, meaning the email chain "physically and emotionally unsafe" and stated "[n]o human being should be subject to microaggressions and cyberbullying."

81.    Plaintiff Williams further contributed to the group discussion,

Through this experience, I have felt silenced and afraid of the responses that I may have received. … These emails raised my anxiety and I was hurt when I read them. The racial innuendos from people that I consider a part of my community were harmful. I really hope moving forward we can take a different approach and I respectfully ask that we conclude this email thread to prevent any additional discomfort.

13

82.     Plaintiff Johnson further asked that the harmful behavior cease.

83.     In response to Plaintiffs' complaints of racial attacks, feelings of unease and fears for their safety based upon the email thread, Prof. Wallace chose to double down on her assertions that Plaintiffs were the enemy.

84.     Specifically, Prof. Wallace responded by calling for the summary dismissal of the Plaintiffs' feelings of racially charged microaggressions and personal attacks, calling them "bizarre and false."

85.     Prof. Wallace went on to state that Plaintiffs could simply not read the emails and encouraged the cohort to continue sharing their thoughts and attacks on the Plaintiffs. Specifically, Prof. Wallace wrote,

> Feel free to speak and share in this safe space, while those who decide to not read this email thread can go back into silent shame for their behavior and stance.

86.     Taking this cue from Prof. Wallace, the cohort continued to hurl threats and attacks at Plaintiffs through the email thread.

## V.     Plaintiff Scarlett and Williams Lodge Multiple Complaints Against Prof. Wallace and Dr. Dolezal with Defendant Teachers College's Administration

76.     Following the beratement from their colleagues, which was commenced, endorsed, and praised by Prof. Wallace, Plaintiffs Johnson and Scarlett raised complaints to various members of Defendant Teachers College's administration regarding Prof. Wallace and Dr. Dolezal.

77.     On or around June 20, 2023, Plaintiff Scarlett called Defendant Teachers College's then-Vice Provost to complain about the ongoing situation involving Prof. Wallace and Dr. Dolezal.

78.    Specifically, Plaintiff Scarlett reported that Prof. Wallace had subjected her and other Black students to discrimination and bullying spurred on by the students' questioning of Dr. Dolezal's fee.

79.    In addition, Plaintiff Scarlett reported that she believed there was financial impropriety occurring related to Dr. Dolezal and Prof. Wallace's consultancy agreement and relationship, and that the Black students were being taken advantage of in a scheme to improperly financially benefit both Dr. Dolezal and Prof. Wallace.

80.    The Vice Provost did not offer any comment or guidance related to Plaintiff Scarlett's complaints of bullying against Prof. Wallace and financial impropriety and potential exploitation against the Black students by Dr. Dolezal and Prof. Wallace.

81.    Upon information and belief, the Vice Provost did not take any steps to investigate Plaintiff Scarlett's serious claims against Defendants' staff members. Nor, upon information and belief, did the Vice Provost advise any other member of Defendants' administrative staff about the complaint so that it could be followed up by the proper departments and personnel.

82.    After her complaints to the Vice Provost proved fruitless, Plaintiff Scarlett emailed Defendant Teachers College's Provost, William Baldwin ("Provost Baldwin") to report her experience in Prof. Wallace's course and the rampant harassment following the payment issue with Dr. Dolezal.

83.    Specifically, Plaintiff Scarlett reported:

Hello Provost Baldwin,

I am writing regarding a severe pattern of **harassment, threats, intimidation and cyberbullying** in Dr. Barbara Wallace's dissertation seminar class. There have been concerning incidents beginning over a year ago, but I and others have been too fearful to say anything. The current incident has reached a climax where I and others have suffered such severe **emotional abuse, the threat of**

**violence, manipulation, gaslighting, cyberbullying, and financial exploitation** that **I need the institution to intervene**.

I spoke with Tom Rock earlier this week to discuss my concerns about the events that led to Dr. Wallace initiated an online riot and her online harassment, which has led to my **physical, mental, and emotional distress**. I am genuinely disappointed that Dr. Wallace **intentionally** created an environment to inflict pain and trauma. I am daunted by my peers engaging in this behavior, sharing in the trauma, and **violating the Student Code of Conduct**. I will enclose copies of the email correspondence in which Dr. Wallace initiated an online riot amongst the RGDH 2022-2023 graduating students to specifically parted and induce fear among her Black and Brown students. Throughout the email correspondence, in which students threatened ill intent, **Dr. Wallace encouraged the behavior** citing free speech in American society. As professionals and educators of the prestigious Teachers College, [Columbia] University, one must be aware of the language and tone (and the institutional policies that govern language and tone) as we must protect and serve underserved communities, specifically marginalized populations, as we empower their lived experiences and intersectional identities. These aforementioned incidents are not isolated. Dr Wallace has taken our silence as permission to continue the long-standing abuse. She **instills fear** regarding our professional career, rapport with our cohort, and overarching professional support as we withstand her **verbal abuse and humiliation**. However, given the **severity of the attacks towards African American students** and the trauma experienced, **some of my classmates and I would like to discuss this matter in further detail depicting the magnitude of the egregious actions and manipulation we have experienced over this past year**. (Emphasis in original).

84.     Plaintiff Scarlett copied Janice Robinson, Defendant Teachers College's Vice President for Diversity and Community Affairs and Title IX Coordinator ("VP Robinson"), as well as Defendant Teachers College's President's Office.

85.     Approximately an hour after Plaintiff Scarlett sent the email, VP Robinson acknowledged receipt of the formal complaint and advised that she would meet with the Program Director, Sonali Rajan ("Director Rajan"), regarding Plaintiff Scarlett's report.

86.     Notably, Director Rajan had already been made aware of the situation via Plaintiff Williams' report to her that same morning, wherein Plaintiff Williams forwarded the cohort's harassing email chain to Director Rajan's attention and asked for help as she (Plaintiff Williams) was feeling unsafe.

### VI.     Prof. Wallace Retaliates Against Plaintiffs and Attacks Black Colleagues Trying to Help Plaintiffs

87.     Upon information and belief, after receipt of Plaintiffs Scarlett's and Williams' complaints against Prof. Wallace, Defendant Teachers College notified Prof. Wallace of Plaintiffs' complaints.

88.     Upon information and belief, no notice was provided to Dr. Dolezal regarding Plaintiff Scarlett's complaints of financial impropriety against him.

89.     Thereafter, Prof. Wallace swiftly and intentionally retaliated against Plaintiffs, as well as those trying to assist them, in a poorly veiled, if not unapologetically open, attempt to tarnish Plaintiffs' professional and personal reputations.

90.     Specifically, on or about June 23, 2023, one of Plaintiffs' fellow professors, Michelle Odlum ("Prof. Odlum") reached out to Plaintiff Williams with a proposal that she (Prof. Odlum) would pay off the Plaintiffs' remaining debt to Dr. Dolezal out of left over research funds she had available.

91.     Upon hearing of this generous offer, an offer which would have swiftly, and without causing further harm or trauma to Plaintiffs, remedied the payment situation, Prof. Wallace became irate.

92.     Upon information and belief, Prof. Wallace aggressively confronted Prof. Odlum about her offer of assistance to Plaintiffs and called Prof. Odlum a "mammy on the plantation" for trying to assist Plaintiffs.

93.     Prof. Wallace's reference to the "mammy on the plantation" was clearly meant to be a racial criticism of Prof. Odlum, as the "mammy" is most well known as a racial caricature of the African-American woman first popularized by white racists during the slavery and Jim Crow eras of American history.

94.     Moreover, following notice of Plaintiffs' complaints against her, as well as Plaintiffs' email communications calling for the immediate end to their cyberbullying and noting racial discrimination in the messages from the cohort, Prof. Wallace lashed out in a group email to Plaintiffs Scarlett and Johnson, copying their other Black professors.

95.     In the emails, sent on June 27, 2023, Prof. Wallace lambasted both Plaintiff Scarlett and Plaintiff Johnson, and stated, in pertinent part:

> Both Dr. Fullilove and Dr. Odlum have been proud of you, but I wanted them both to know that your *[sic]* following behind your other (Black) peers in failing to pay your bill with Dr. Dolezal, has further justified my decision to dissolve the Research group on Disparities in health as of June 19, 2023. The fact that the Black students in RGDH are the ones engaging in non-payment is one of the biggest embarrassments I think any of us could imagine as the three Black professors who supported your path to dissertation completion.

96.      In addition, Prof. Wallace threatened Plaintiff Scarlett and Plaintiff Johnson that she would withhold and/or stop conferral of their degrees unless they immediately and without further complaint to Defendant Teachers College, paid the dues to Dr. Dolezal.

97.     Moreover, on June 28, 2023, Prof. Wallace sent an email to Plaintiff Williams advising that unless Plaintiff Williams immediately paid Dr. Dolezal the amount demanded, Prof. Wallace would "rescind [her] glowing recommendation (referring to a recommendation Prof. Williams had previously made on Plaintiff Williams' behalf) and inform [the recipient] that [she] can no longer support the letter's description of [Plaintiff Williams'] character."

98.     Prof. Wallace further threatened to take steps to rescind the letter entirely, thereby threatening and jeopardizing Plaintiff Williams' career prospects.

99.     Tired of the constant attacks against them spearheaded by Prof. Wallace, Plaintiffs again sought assistance from Defendant Teachers College's administration.

100.    On June 28, 2023, Plaintiff Johnson sent an email to Provost Baldwin reporting Prof. Wallace's ongoing behavior and threats to his dissertation and degree conferral.

101.    Eventually, the issue regarding payment to Dr. Dolezal was resolved, with no assistance or intervention of any of Defendant Teachers College's administration.

102.    Rather, the offer from Prof. Odlum to pay Plaintiffs' outstanding balance was accepted by Dr. Dolezal.

103.    Even then, Prof. Wallace could not help but denigrate Plaintiffs in her final email to Dr. Dolezal regarding the topic, calling Plaintiffs "disrespectful" and "ugly."

## VII.    Defendant Teachers College Pulls Plaintiff Williams' Application for Employment from Consideration

104.    In or around March, 2023, Plaintiff Williams applied for a Lecturer position with Defendant Teachers College.

105.    Based on her impressive application, Plaintiff Williams was invited to interview for the position.

106.    Plaintiff Williams successfully completed the first round of interviews in April 2023 and was thereafter invited to come back for a second-round interview.

107.    Plaintiff Williams was amply qualified to fill the Lecturer position and, following her interview, was advised by Defendant Teachers College's hiring committee that she was a "shoo in" and *the* top candidate for the role.

108.    Confident that she had secured the position, Plaintiff Williams was excited to begin her career after having earned her doctoral degree.

109.    During this time, Plaintiff Williams, along with Plaintiffs Scarlett and Johnson, raised complaints (i) against Prof. Wallace regarding her harassing behavior, and also raised concerns about racial microaggressions and undertones in Prof. Wallace's behavior and (ii) against Dr. Dolezal for financial impropriety and extortion of students.

110.    Thereafter, for reasons never fully shared with Plaintiff Williams, Defendant Teachers College advised Plaintiff Williams that the college had decided to hire a different candidate, despite having advised Plaintiff Williams that she was the best candidate to fill the position.

111.    This position was not noted as having been filled and the instructor position remained open, despite Defendant Teachers College's representations to the contrary.

112.    Upon information and belief, despite knowing that Plaintiff Williams was the best candidate to fill the open Lecturer role, Defendant Teachers College opted to pass over Plaintiff Williams' application in light of her complaints regarding Defendants' staff.

113.    Upon information and belief, Defendant Teachers College has not filled the Lecturer position for which Plaintiff Williams originally applied.

**VIII.   Prof. Wallace Announces Her Retirement from Defendant Teachers College**

114.    As anticipated, the 2022-2023 academic year was Prof. Wallace's last teaching year at Defendant Teachers College.

115.    In line with her statements earlier in the year, Prof. Wallace announced her retirement to her students on August 29, 2023, effective September 1, 2023.

116.    Upon information and belief, based on Prof. Wallace's announcement to her students, Prof. Wallace had notified Defendant Teachers College of her retirement on or about August 1, 2023.

117.    In her August 29th retirement announcement, Prof. Wallace stated that she was happy to retire after 33 years of service to Defendant Teachers College and honored to accept the distinguished title of Professor Emeritus.

118.    Prof. Wallace advised in her August 29th announcement that her decision to retire came after months of deliberation and a desire to step back from work, care for her ailing mother and enjoy the time she had remaining with her, and work on a forthcoming book chronicling, or in Prof. Wallace's words, "celebrating," her career at Defendant Teachers College.

## IX.    Defendant Teachers College Finally, and Belatedly, Takes Action on Plaintiffs' Complaints Against Prof. Wallace Only

119.    On August 16, 2023, nearly two months after receipt of Plaintiffs Scarlett's and Johnson's complaints and only after Prof. Wallace advised Defendant Teachers College of her decision to retire for reasons unrelated to Plaintiffs, Defendant Teachers College finally took the first step to address Plaintiffs' complaints.

120.    On August 16, 2023, two attorneys retained by Defendant Teachers College contacted Plaintiffs' counsel and advisor via email to schedule interviews with Plaintiffs Johnson and Scarlett as part of an investigation regarding Prof. Wallace.

121.    Notably, the investigators did not reference or seek to speak with Plaintiff Williams, despite Plaintiff Williams' unequivocal complaints against Prof. Wallace which largely mirrored the complaints submitted by Plaintiffs Johnson and Scarlett.

122.    Defendant Teachers College never provided any reason why Plaintiff Williams was not included in their investigation into Prof. Wallace's reported misconduct.

123.   Moreover, the investigation did not reference any of the reports of financial impropriety Plaintiffs raised against Dr. Dolezal.

124.   Upon information and belief, Dr. Dolezal was not considered a part of the investigation at all, let alone a respondent to the investigation.

125.   Although skeptical of Defendant Teachers College's intent in beginning the long-delayed investigation on the eve of Prof. Wallace's retirement, Plaintiffs Scarlett and Johnson dutifully participated in interviews on September 8, 2023 with the investigators.

126.   During their respective interviews, both Plaintiffs Scarlett and Johnson reported their experience in the Seminars, including Prof. Wallace's inappropriate comments to the class and noted hostility toward Black students, as well as the circumstances leading to their reports of discrimination and harassment.

127.   Both Plaintiffs Scarlett and Johnson further reported their concerns regarding the financial arrangement with Dr. Dolezal and the potential impropriety of such arrangement with Prof. Wallace.

128.   Notably, the investigators failed to follow up with any line of questioning related to reports against Dr. Dolezal and merely acted as though such statements and reports were not made, again, during Plaintiffs Scarlett's and Johnson's respective interviews.

**X.     Defendant Teachers College Purposefully Waited Until It is Divested of Jurisdiction to Render any Conclusion on the Investigation**

129.   Following the interviews, Plaintiff Johnson submitted additional documentation in support of his and Plaintiff Scarlett's complaints. Plaintiffs then patiently, albeit painfully, waited to hear the results of the investigation.

130.    Despite efforts by their counsel and advisor, Plaintiffs Scarlett and Johnson did not receive any update or information related to their complaints until January 12, 2024, nearly four months later.

131.    At such time, Plaintiffs Scarlett and Johnson learned, via separate letters from VP Johnson (the "Outcome Letters"), that Defendant Teachers College had concluded its investigation against Prof. Wallace and concluded that Prof. Wallace had "engaged in discriminatory harassment" and "retaliation."

132.    The Outcome Letters further advised that "disciplinary recommendations for [Prof.] Wallace [would] be provided…"

133.    Notably, there was no mention of Dr. Dolezal or Plaintiffs' complaints that Dr. Dolezal, a White faculty member, had engaged in financial impropriety and policy violations related to his consultancy fee arrangement with Prof. Wallace.

134.    In essence, Defendants protected Dr. Dolezal, the only White individual at the center of this controversy, from any investigation or potential repercussions after credible reports of his financial impropriety were received by multiple employees at Defendant Teachers College.

135.    Moreover, Defendants ignored reports against Prof. Wallace which implicated potential wrongdoing on Dr. Dolezal's part, once again shielding the only White individual at the center of this controversy from any consequences for Prof. Wallace's bad behavior.

136.    However, as of January 12, 2024, Prof. Wallace was no longer working for or, to Plaintiffs' knowledge, in any way affiliated with Defendant Teachers College or Defendant Columbia. Nor were Plaintiffs any longer enrolled at either Defendant Teachers College or Defendant Columbia.

137.    Upon information and belief, Defendants intentionally waited to commence the investigation, and thereafter unduly prolonged the investigative process, until such time as any and all authority or power Defendants had over Prof. Wallace was lost.

138.    Defendants' investigation into Prof. Wallace and Plaintiffs' complaints of discrimination and retaliation was nothing more than a smokescreen meant to appease Plaintiffs, but ultimately proved pointless.

139.    Indeed, upon information and belief, no disciplinary action has been recommended, let alone taken, against Prof. Wallace by either Defendant Teachers College or Defendant Columbia, who continues to enjoy the distinguished title of Professor Emeritus at Defendant Teachers College.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION
*(Race Discrimination in violation of the N.Y. State Human Rights Law, N.Y. Exec. Law § 296)*
*(On Behalf of all Plaintiffs Against all Defendants)*

140.    Plaintiffs repeat and re-allege each and every allegation above with the same force and effect as if fully set forth herein.

141.    At all times relevant, Plaintiffs are each individually members of a protected class.

142.    At all times relevant to this Complaint, Defendants were each individually and jointly a "place of public accommodation" as defined by the New York State Human Rights Law.

143.    The New York State Human Rights Law, and its implementing regulations, prohibit places of public accommodation, such as Defendants, from discrimination against individuals on the basis of, among other things, race.

144.    Neither Defendant Teachers College nor Defendant Columbia, as educational institutions, fall under any of the enumerated exceptions exempting them from liability for discrimination under the New York State Human Rights Law as places of public accommodation.

145.    As set forth herein and above, Plaintiffs were each individually and as a group subjected to hostile educational environment, consisting of, among other things, threats to the conferral of their degrees, public ridicule and criticism of their professional and personal characters, threats to their candidacy for future employment, financial exploitation, and dismissal of their valid reports of racial discrimination and bias.

146.    As set forth herein and above, the hostility and discrimination Plaintiffs were subjected to had severe negative effects on Plaintiffs' respective educational environments.

147.    As a result of Defendants' actions and/or inaction, Plaintiffs have suffered significant damages, including but not limited to, emotional distress and severe mental anguish, loss of educational and professional opportunities, and financial losses.

148.    Based on the foregoing, Defendants discriminated against Plaintiff in violation of the New York State Human Rights Law and are therefore liable to Plaintiffs in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

**AS AND FOR A SECOND CAUSE OF ACTION**
*(Race Discrimination in Violation of Title VI of the Civil Rights Act)*
*(On Behalf of all Plaintiffs Against all Defendants)*

149.    Plaintiffs repeats and re-allege each and every allegation above with the same force and effect as if fully set forth herein.

150.    At all times relevant, Plaintiffs are each individually members of a protected class.

151.    Title VI of the Civil Rights Act ("Title VI") states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be

denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

152.    At all times relevant, Defendants Columbia and Teachers College received, and continue to receive, federal financial assistance and is therefore subject to the requirements of Title VI.

153.    As set forth herein and above, Plaintiffs were each individually and as a group subjected to a hostile educational environment, consisting of, among other things, threats to the conferral of their degrees, public ridicule and criticism of their professional and personal characters, threats to their candidacy for future employment, financial exploitation, and dismissal of their valid reports of racial discrimination and bias.

154.    As set forth herein and above, the hostility and discrimination Plaintiffs were subjected to had severe negative effects on Plaintiffs' respective educational environments.

155.    As a result of Defendants' actions and/or inaction, Plaintiffs have suffered significant damages, including but not limited to, emotional distress and severe mental anguish, loss of educational and professional opportunities, and financial losses.

156.    Based on the foregoing, Defendants discriminated against Plaintiffs in violation of Title VI and are therefore liable to Plaintiffs in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR A THIRD CAUSE OF ACTION
*(Race Discrimination in Violation of Title II of the Civil Rights Act)*
*(On Behalf of all Plaintiffs Against all Defendants)*

157.    Plaintiffs repeat and re-allege each and every allegation above with the same force and effect as if fully set forth herein.

158.    At all times relevant, Plaintiffs are each individually members of a protected class.

159.     Title II of the Civil Rights Act ("Title II") states, in pertinent part, that [a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation … without discrimination on the ground of race…"  42 U.S.C. § 2000(a).

160.     At all times relevant to this Complaint, Defendants were each individually and jointly a "place of public accommodation" as defined by Title II.

161.     As set forth herein and above, Plaintiffs were each individually and as a group subjected to hostile educational environment, consisting of, among other things, threats to the conferral of their degrees, public ridicule and criticism of their professional and personal characters, threats to their candidacy for future employment, and dismissal of their valid reports and feelings of racial discrimination and bias.

162.     As set forth herein and above, the hostility and discrimination Plaintiffs were subjected to had severe negative effects on Plaintiffs' respective educational environments.

163.     As a result of Defendants' actions and/or inaction, Plaintiffs have suffered significant damages, including but not limited to, emotional distress and severe mental anguish, loss of educational and professional opportunities, and financial losses.

164.     Based on the foregoing, Defendants discriminated against Plaintiffs in violation of Title II and are therefore liable to Plaintiffs in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

<u>**AS AND FOR A FOURTH CAUSE OF ACTION**</u>
*(Race Discrimination in Violation of the New York City Human Rights Law)*
*(On Behalf of all Plaintiffs Against all Defendants)*

165.     Plaintiffs repeat and re-allege each and every allegation above with the same force and effect as if fully set forth herein.

166.   At all times relevant, Plaintiffs are each individually members of a protected class.

167.   At all times relevant to this Complaint, Defendants were each individually and jointly a "place of public accommodation" as defined by the New York State Human Rights Law.

168.   The New York City Human Rights Law, and its implementing regulations, prohibit places of public accommodation, such as Defendants, from discrimination against individuals on the basis of, among other things, race.

169.   Neither Defendant Teachers College nor Defendant Columbia, as educational institutions, fall under any of the enumerated exceptions exempting them from liability for discrimination under the New York State Human Rights Law as places of public accommodation.

170.   As set forth herein and above, Plaintiffs were each individually and as a group subjected to hostile educational environment, consisting of, among other things, threats to the conferral of their degrees, public ridicule and criticism of their professional and personal characters, threats to their candidacy for future employment, and dismissal of their valid reports and feelings of racial discrimination and bias.

171.   As set forth herein and above, the hostility and discrimination Plaintiffs were subjected to had severe negative effects on Plaintiffs' respective educational environments.

172.   As a result of Defendants' actions and/or inaction, Plaintiffs have suffered significant damages, including but not limited to, emotional distress and severe mental anguish, loss of educational and professional opportunities, and financial losses.

173.   Based on the foregoing, Defendants discriminated against Plaintiffs in violation of the New York City Human Rights Law and are therefore liable to Plaintiffs in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR A FIFTH CAUSE OF ACTION
*(Retaliation in Violation of the New York City Human Rights Law)*
*(On Behalf of Plaintiff Williams Against Defendant Teachers College)*

174.    Plaintiffs repeat and re-allege each and every allegation above with the same force and effect as if fully set forth herein.

175.    As set forth herein and above, Plaintiff Williams was and is a member of a protected class.

176.    As set forth herein and above, Plaintiff Williams applied for and was the leading candidate for an employment position with Defendant Teachers College.

177.    Plaintiff Williams was undoubtedly qualified for the position for which she was a candidate and was all but offered the position during the interviewing process.

178.    During the interviewing process, Plaintiff Williams raised concerns about the harassment, bullying tactics, and discriminatory behaviors of Prof. Wallace to Defendant Teachers College's administration, including those who were also members of the hiring and/or interview committee for Plaintiff Williams' prospective employment position.

179.    Following her complaints against Prof. Wallace, Plaintiff Williams was unceremoniously told that the employment position was no longer available and Defendant Teachers College had decided to hire another candidate.

180.    In reality, the position remained open and unfilled following Plaintiff Williams' rejected candidacy.

181.    Defendant Teachers College did not have a legitimate basis for which to deny Plaintiff Williams employment and, by Defendant Teachers College's own actions and/or inactions, did not intend to deny Plaintiff Williams employment until *after* Plaintiff Williams raised complaints against Prof. Wallace.

182.    Accordingly, Defendant Teachers College's refusal to hire Plaintiff Williams was retaliation for Plaintiff Williams' lawful complaints of harassment and racial discrimination.

183.    As a result of Defendant Teachers College's actions and/or inaction, Plaintiff Williams has suffered significant damages, including but not limited to, loss of employment, financial losses, emotional distress and severe mental anguish, loss of educational and professional opportunities, and financial losses.

184.    Based on the foregoing, Defendant Teachers College discriminated against Plaintiff Williams in violation of the New York City Human Rights Law and is therefore liable to Plaintiff Williams in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR A SIXTH CAUSE OF ACTION
*(Retaliation in Violation of the New York State Human Rights Law)*
*(On Behalf of Plaintiff Williams Against Defendant Teachers College)*

185.    Plaintiffs repeat and re-allege each and every allegation above with the same force and effect as if fully set forth herein.

186.    As set forth herein and above, Plaintiff Williams was and is a member of a protected class.

187.    As set forth herein and above, Plaintiff Williams applied for and was the leading candidate for an employment position with Defendant Teachers College.

188.    Plaintiff Williams was undoubtedly qualified for the position for which she was a candidate and was all but offered the position during the interviewing process.

189.    During the interviewing process, Plaintiff Williams raised concerns about the harassment, bullying tactics, and discriminatory behaviors of Prof. Wallace to Defendant Teachers

Collee's administration, including those who were also members of the hiring and/or interview committee for Plaintiff Williams' prospective employment position.

190.    Following her complaints against Prof. Wallace, Plaintiff Williams was unceremoniously told that the employment position was no longer available and Defendant Teachers College had decided to hire another candidate.

191.    Notably, however, the position remained unfilled.

192.    Defendant Teachers College did not have a legitimate basis for which to deny Plaintiff Williams employment and, by Defendant Teachers College's own actions and/or inactions, did not intend to deny Plaintiff Williams employment until *after* Plaintiff Williams raised complaints against Prof. Wallace.

193.    Accordingly, Defendant Teachers College's refusal to hire Plaintiff Williams was retaliation for Plaintiff Williams' lawful complaints of harassment and racial discrimination.

194.    As a result of Defendant Teachers College's actions and/or inaction, Plaintiff Williams has suffered significant damages, including but not limited to, loss of employment, financial losses, emotional distress and severe mental anguish, loss of educational and professional opportunities, and financial losses.

195.    Based on the foregoing, Defendant Teachers College discriminated against Plaintiff Williams in violation of the New York State Human Rights Law and is therefore liable to Plaintiff Williams in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## JURY DEMAND

196.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury on all claims in this action.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiffs seek a judgment against Defendants as follows:

    (i)     An award of damages against Defendants on Plaintiffs' claims, as outlined above, including, without limitation, in reimbursement of and prepayment for all of Plaintiffs' expenses including expenses incurred as a consequence of the discrimination they endured; damages for deprivations of the equal access to the education benefits and opportunities provided by Defendants; reimbursement of tuition and expenses paid by Plaintiffs to Defendants incurred as a result of Defendants unlawful actions; and damages for past, present, and future emotional pain and suffering, and loss of past, present, and future earnings in an amount to be determined at trial;

    (ii)    Punitive and/or exemplary damages against Defendants, where available;

    (iii)   Statutory pre- and post-judgment interest on all sums awarded, where available;

    (iv)   An award of costs and attorneys' fees; and

    (v)    Any other relief the Court finds just and proper.

Dated this 28th day of May, 2024

                   **Respectfully submitted,**

                   **NESENOFF & MILTENBERG, LLP.**

                   **By:** *s/ Andrew Miltenberg*
                   **Andrew Miltenberg, Esq.**
                   **Stuart Bernstein, Esq.**
                   **Gabrielle Vinci, Esq.**
                   **Nesenoff & Miltenberg, LLP.**
                   **363 Seventh Avenue, Fifth Floor**
                   **New York, New York 10001**
                   **Tel: 212-736-4500**
                   **Fax: 212-736-2260**
                   **Email: amiltenberg@nmllplaw.com**
                   **Email: sbernstein@nmllplaw.com**
                   **Email: gvinci@nmllplaw.com**

                   ***Attorneys for Plaintiffs***

## VERIFICATION

STATE OF _New York_ )
                         ) ss.:
COUNTY OF _Queens_ )

**Dr. Jonathan Johnson,** being duly sworn, deposes and says:

I am a named Plaintiff in this matter. I have read the annexed Complaint, know the contents thereof, and the same are true to my knowledge, except as to matters alleged upon information and belief and as to those matters, I believe them to be true.

_____
Dr. Jonathan Johnson

Sworn to and subscribed before me

this _13th_ day of _June_, 2024.

_____
NOTARY PUBLIC

Rukhsar Jahan
Notary Public State of New York
Registration NO 01JA6435414
Qualified in Queens County
My Commission Expires June 27, 2026

## VERIFICATION

STATE OF MD                )
                                        ) ss.:
COUNTY OF Prince George's )

**Dr. Charmaine Scarlett,** being duly sworn, deposes and says:

I am a named Plaintiff in this matter. I have read the annexed Complaint, know the contents thereof, and the same are true to my knowledge, except as to matters alleged upon information and belief and as to those matters, I believe them to be true.

*Charmaine Scarlett*

Dr. Charmaine Scarlett

**Sworn to and subscribed before me**

this 28 day of May , 2024.

*a. Welch*

**NOTARY PUBLIC**

ANTWANNETTE WELCH
NOTARY PUBLIC
Prince George's County, Maryland
My Commission Expires 9/16/2025

## VERIFICATION

STATE OF _NEW YORK_ )
                       ) ss.:
COUNTY OF _Queens_ )

**Dr. Shameika Williams,** being duly sworn, deposes and says:

I am a named Plaintiff in this matter. I have read the annexed Complaint, know the contents thereof, and the same are true to my knowledge, except as to matters alleged upon information and belief and as to those matters, I believe them to be true.

_____
Dr. Shameika Williams

Sworn to and subscribed before me

this __17__ day of __JUNE__, 2024.

_____
NOTARY PUBLIC

SAUD A ANSARI
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01AN6012752
Qualified in Nassau County
My Commission Expires August 31, 20__26__